**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| American Family Insurance and Liberty Mutual Insurance,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>City of Minneapolis,<br><br>　　　　　Defendant. | Case No. 14-cv-1428 (SRN/SER)<br><br><br>**MEMORANDUM OPINION AND ORDER** |

Lawrence M. Baill and Steven L. Theesfeld, Yost & Baill, LLP, 2050 U.S. Bank Plaza South, 220 South Sixth Street, Minneapolis, Minnesota 55402, for Plaintiffs.

Gregory P. Sautter and Brian S. Carter, Minneapolis City Attorney's Office, 350 South Fifth Street, Room 210, Minneapolis, Minnesota 55415, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

## I. INTRODUCTION

This matter is before the Court on Defendant City of Minneapolis's Motion for Summary Judgment [Doc. No. 27]. For the reasons stated below, the Court grants Defendant's Motion.

## II. BACKGROUND

### A. The Water-Main Break and Claims for Damages

This lawsuit arises from a water-main break that occurred on October 20, 2013, under Portland Avenue, between South Seventh Street and South Eighth Street, in

Minneapolis, Minnesota. (See Am. Compl. [Doc. No. 15] ¶ 17.)[1] As a result of the break, water flowed into the Sexton Condominium building, which is owned by the Sexton Condominium Association, Inc. ("Sexton"), and flooded basement units owned by Juliana Koe and Jane Grenell. (Id. ¶ 18.) Defendant City of Minneapolis (the "City") fixed the break within twelve hours. (Carter Decl. [Doc. No. 30] ¶ 2 & Ex. 1 (Water Main Leak Record).) However, Sexton, Ms. Koe, and Ms. Grenell suffered damages in excess of $1.3 million, $25,000, and $20,000, respectively. (See id. ¶ 3 & Ex. 2 (Pls.' Resp. to Def.'s Interrogs.), at 3.) Sexton recouped its losses from its insurer, Defendant American Family Insurance, and Ms. Koe and Ms. Grenell recovered their losses from their insurer, Defendant Liberty Mutual Insurance. (Id.)

Thereafter, several entities and individuals submitted to the City claims for damages associated with the water-main break. (See id. ¶ 4 & Ex. 3 (Def.'s Answers to Pls.' Interrogs.), at 2–4.) The City settled fourteen claims for losses that were not covered by insurance. (See id.) Thirteen of those claims were made by natural persons who were tenants of the Sexton Condominiums, and one of those claims was made by Sexton. (See id.) The City paid these claims without requiring any evidence that the water main broke as a result of the City's negligence. (Velasco-Thompson Dep. [Doc. No. 34] at 14:20–15:17.) Ellen Velasco-Thompson, the City's Director of Risk Management and Claims, testified in her deposition that in such instances—i.e., where the City agrees to pay a claim even in the

---

[1] Defendant relies upon many facts as stated in the Amended Complaint for purposes of this Motion. (Def.'s Mem. of Law in Supp. of Its Mot. for Summ. J. [Doc. No. 29] at 2 n.3.)

2

absence of evidence of the City's negligence—the City is "taking care of temporary housing needs that are imminent and vital to the safety of the residents." (Id. at 72:25-27.)

The claims denied by the City were each submitted by insurance companies, including Plaintiffs American Family and Liberty Mutual. (See Carter Decl. ¶ 4 & Ex. 3, at 2–4.) As "mutual" insurance companies, Plaintiffs are owned by their policyholders. (See Gribble Aff. [Doc. No. 35] ¶ 2; Litke Aff. [Doc. No. 39] ¶ 2.) According to Dwight Gribble, a claim director for American Family, "casualty losses are absorbed by . . . policyholder members and profits are passed through to . . . policyholder members in the form of lower premiums." (Gribble Aff. ¶ 2.) Thus, subrogation recoveries are factored into the premium rates charged. (Id. ¶ 3; Litke Aff. ¶ 3.)

**B.     Maintenance of the City's Water Distribution System**

During the course of discovery in this matter, Plaintiffs took the deposition of the City's Superintendent of Water Distribution, Marie Asgian. (See Asgian Dep. [Doc. No. 33].) Ms. Asgian is responsible for the maintenance, repairs, and improvements to the City's water distribution system. (Id. at 5:1-13.) In terms of prioritizing funds used for the replacement or structural lining of water mains, Ms. Asgian testified as follows:

> We look at where there is a leak history, we look at what else is going on in the area in terms of development, we allocate our resources according to what money we have for that year and prioritize based on the needs of the overall program, which includes other aspects other than replacement.

(Id. at 10:1-6.) And, when asked about the decision to structurally line the water main at issue in this litigation (which is one of the older water mains in Minneapolis) after the break on October 20, 2013, she similarly pointed to "a combination of factors, being the history of

leaks in the area, the potential for development with the stadium, and the consequence of failure." (Id. at 11:15–12:6, 19:29–20:1.)

### C. This Lawsuit

Plaintiffs initiated this lawsuit in Minnesota state court on April 17, 2014, asserting claims for negligence, trespass, and violation of the Equal Protection Clause. (Notice of Removal [Doc. No. 1], Ex. 2 (Compl.) at 4–7.) The City removed the action to this Court on May 7, 2014, and Plaintiffs subsequently amended the complaint and added takings claims under the U.S. and Minnesota Constitutions. (See Am. Compl. ¶¶ 45–54.) Thus, Plaintiffs' Amended Complaint asserts five causes of action against the City: negligence (Count I), trespass (Count II), violation of the Equal Protection Clause (Count III), and federal- and state-law takings (Counts IV and V, respectively). (See id. ¶¶ 27–54.) Count I was dismissed with prejudice on May 13, 2015 pursuant to the parties' stipulation [Doc. No. 26]. The City thereafter filed its Motion for Summary Judgment, and the matter was taken under advisement on the papers.

## III. DISCUSSION

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). Summary judgment is proper if, drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp., 477 U.S. at 322–23;

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50 (1986). A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the substantive law. Anderson, 477 U.S. at 248. A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

Although the party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed, Celotex Corp., 477 U.S. at 323, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 256. Thus, the movant is entitled to summary judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322. No genuine issue of material fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

The City argues that summary judgment is appropriate on each of Plaintiffs' remaining claims. (Def.'s Mem. of Law in Supp. of Its Mot. for Summ. J. [Doc. No. 29] ("Def.'s Mem.") at 1–2.) The Court agrees.

**A.  Trespass**

In Count II, Plaintiffs assert that the City is liable for trespass because the water from the water-main break entered the Sexton Condominiums without the owners' consent. (See Am. Compl. ¶¶ 33–36.) The City argues that it is entitled to summary judgment on this claim because there is no evidence in the record of intent, which is necessary to prevail on a

5

trespass claim. (Def.'s Mem. at 6.) More specifically, the City asserts that there is no evidence that the City intended for the water main to break or for the water to enter the Sexton Condominium building, or that the City believed with substantial certainty that the water main would break and flood the Sexton Condominium building. (Id.) In opposition, Plaintiffs argue that "causation and not just intent to cause harm" is sufficient to demonstrate trespass, and that the City "caused water to flood nearby property by intentionally abandoning its past practice of repairing leaking water mains." (Pls.' Am. Mem. of Law in Opp. to Def.'s Mot. for Summ. J. [Doc. No. 38] ("Pls.' Opp.") at 14.) In any event, Plaintiffs assert, the fact that the City knew that the water main was beyond its useful life and had a history of leaking, but did not eliminate the danger, demonstrates both "causation" and intent. (See id. at 14–15.)

      The Court agrees with the City. "[T]he tort of trespass is committed when a person 'intentionally enters or causes direct and tangible entry upon the land in possession of another.'" Johnson v. Paynesville Farmers Union Coop. Oil Co., 817 N.W.2d 693, 701 (Minn. 2012) (quoting Dan B. Dobbs, The Law of Torts § 50, at 95 (2000)). In other words, "[t]he 'gist of the tort' of trespass . . . is the 'intentional interference with rights of exclusive possession.'" Id. (quoting Dobbs, supra, § 50, at 95). "Intent or intentionally means that the actor desires to cause consequences of his act or that he believes that the consequences are substantially certain to result from it." Victor v. Sell, 222 N.W.2d 337, 339 (Minn. 1974) (affirming the trial court's use of the Restatement's definition of "intent" in its jury instructions regarding trespass).

Here, Plaintiffs have misconstrued the definition of intent. While a trespass may occur where a person "causes" entry upon the land of another, the person must still intend to cause that entry. And, Plaintiffs point to no evidence in the record that the City intended for the water main to break, intended to cause the water to enter the Sexton Condominium building, or believed with substantial certainty that such events would occur. Instead, Plaintiffs rely on the argument that the City caused the flooding by failing to repair the water main, pointing to Ms. Asgian's testimony regarding the age of the water main at issue and the factors considered when deciding whether to line a particular water main. (See Pls.' Opp. at 14.) Another Judge in this District rejected similar reasoning in Soo Line Railroad Co. v. Werner Enterprises, 8 F. Supp. 3d 1130 (D. Minn. 2014). In that case, a railroad company sued the owner of a truck for trespass after the truck collided with one of the railroad company's trains. Id. at 1133. The owner of the truck moved for summary judgment, arguing that the truck driver was medically incapacitated by a heart attack at the time of the collision. Id. at 1134. In granting the motion, the court rejected the railroad company's argument that the driver acted with intent by intentionally ignoring his medical symptoms and withholding information from his physician, noting that "[s]uch arguments, while potentially relevant to a negligence claim, do not demonstrate intent for the trespass claim." Id. at 1141. Likewise, assuming, without deciding, that one could infer from Ms. Asgian's testimony that the City failed to make repairs that could have prevented the water-main break, one cannot infer that any such failure was intended to cause a water-main break or was substantially certain to result in a water-main break that would flood the Sexton Condominiums. At most, her testimony

7

could be relevant to a negligence claim. Accordingly, because no reasonable jury could find that the City intended to cause the water from the water-main break to enter the Sexton Condominium building, summary judgment is appropriate on Plaintiffs' trespass claim.

**B.     Equal Protection**

In Count III, Plaintiffs allege that the City violated the Equal Protection Clause by agreeing to reimburse certain residents of the Sexton Condominiums for their uninsured losses while refusing to reimburse Plaintiffs. (See Am. Compl. ¶¶ 37–44.) "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." True v. Nebraska, 612 F.3d 676, 683 (8th Cir. 2010) (citation and internal quotation marks omitted). Thus, State actors do not run afoul of the Equal Protection Clause by treating dissimilarly-situated people differently. Ganley v. Minneapolis Park & Recreation Bd., 491 F.3d 743, 747 (8th Cir. 2007). If a State treats similarly-situated persons differently, but without targeting a suspect class or burdening a fundamental right, the State's actions are subject to rational basis review. Id. Under this review, "the State need only show that the differential treatment is rationally related to a legitimate state interest." True, 612 F.3d at 683 (citation and internal quotation marks omitted).

The City argues that it is entitled to summary judgment on Count III because there is no evidence in the record that the City treated Plaintiffs, as corporations, differently than it treated individuals. (Def.'s Mem. at 7.) Rather, the City asserts, it made settlement decisions based on the nature of the loss—i.e., insured versus uninsured—

8

rather than the type of person who made the claim. (Id. at 7–8.) Moreover, the City argues, Plaintiffs, as insurance companies, cannot establish that they are similarly situated to uninsured natural and corporate persons because Plaintiffs are in the business of assuming risk (and receive premium payments in exchange for doing so), and because they did not experience property damage or the attendant personal distress. (Id. at 9–11.) Finally, the City argues that if its actions are subject to review, they are subject to rational basis review (because an insurer is not a member of a suspect class and pre-litigation settlement is not a fundamental right) and that its decision to settle claims with uninsured persons was rationally related to its legitimate interests in protecting the welfare of people within its jurisdiction and minimizing costs and litigation risks. (Id. at 11–19.)

In response, Plaintiffs argue that they are similarly situated to the uninsured property owners because "uninsured property owners are just self-insured property owners" and "Plaintiffs assume the 'similarly situated' status of their insureds" through subrogation. (Pls.' Opp. at 15–16.) Moreover, Plaintiffs contend, all of their losses are passed through to their natural-person policyholders "who directly experience harm in the form of increase[d] premiums." (Id. at 16–17.) Plaintiffs also argue that this Court should break with precedent and recognize property rights as a fundamental right, the burdening of which is subject to strict scrutiny. (See id. at 17 n.1.) In the alternative, Plaintiffs assert that this Court should find that the City's stated interests are not legitimate because they were based on a subjective sympathy analysis and ignored the welfare of its insured citizens. (See id. at 18–20.)

The Court is not persuaded by Plaintiffs' arguments. First, Plaintiffs have failed to raise a triable issue of fact as to whether they are similarly situated to the individuals and entities with whom the City settled claims. The record demonstrates that each of those claims concerned losses sustained by the actual property owner and for which the owner was not insured. On the other hand, the claims that were denied by the City—including Plaintiffs' claims—were all made by insurance companies, which are in the business of assuming the risk of flooding (and did so in this case, as evidenced by the payment of their insureds' claims) and are compensated by premium payments for doing so.

Second, Plaintiffs do not argue that they are members of a suspect class and they acknowledge that, under the current state of the law, property rights are not fundamental rights for purposes of equal protection analysis. (See Pls.' Opp. at 17 n.1.) This Court is bound to apply that precedent. See Weems v. Little Rock Police Dep't, 453 F.3d 1010, 1015–16 (8th Cir. 2006) (rejecting the argument that the "'right to acquire, enjoy, own and dispose of property'" is a fundamental right for purposes of equal protection analysis). Accordingly, assuming that Plaintiffs could demonstrate that they are similarly situated to the uninsured claimants, the City's actions in denying Plaintiffs' claims are subject only to rational basis review. And, the City's contention that it made its payment decisions based on concerns for the safety and welfare of its citizens passes scrutiny under that standard. See, e.g., Mills v. City of Grand Forks, 614 F.3d 495, 501 (8th Cir. 2010) (applying rational basis review when analyzing an equal protection claim and finding that the City of Grand Forks had "a legitimate interest in protecting the health and

safety of [its] residents"). Accordingly, the City is entitled to summary judgment on Plaintiffs' equal protection claim.

### C.     Takings

Finally, in Counts IV and V, Plaintiffs claim that the City is "liab[le] for inverse condemnation" because the flooding constituted an uncompensated taking under the U.S. and Minnesota Constitutions, respectively. (See Am. Compl. ¶¶ 45–54.) Under both constitutions, "private property may not be taken without just compensation." Snaza v. City of Saint Paul, 548 F.3d 1178, 1181 (8th Cir. 2008) (citing U.S. Const. amend. V; Minn. Const. art. I, § 13). The City argues that the federal claim must be dismissed because Plaintiffs have failed to exhaust their state remedies, that the state claim must be dismissed because it may only be asserted through a mandamus action, and that, in any event, Plaintiffs cannot establish a taking under either the U.S. or Minnesota Constitution. (See Def.'s Mem. at 19–26.)

Plaintiffs, on the other hand, contend that their takings claims should proceed because an inverse condemnation proceeding is unnecessary given that there was no permanent injury and the City has admitted liability and damages, the City has already denied the takings claim and so returning to state court would be futile, and Plaintiffs followed the City's claims procedure to a final disposition and were not notified by the City that any other state procedure was necessary. (Pls.' Opp. at 21–24.) Plaintiffs also argue that the Minnesota Supreme Court has held that a citizen can bring a direct action for damages under the Takings Clause of the Minnesota Constitution without pursuing condemnation proceedings. (Id. at 24.) Finally, Plaintiffs assert that they are entitled to

compensation under both Constitutions because a temporary physical invasion, or one that causes property damage, can constitute a taking. (See id. at 24–28.)

The Court finds that Plaintiffs' federal takings claim is not ripe for review and that Plaintiffs' state takings claim is procedurally defective. In summarizing U.S. Supreme Court precedent, the Eighth Circuit stated that "a property owner may not bring a federal claim for violation of the Just Compensation Clause until it has exhausted any available state procedure for seeking just compensation and been denied it." Snaza, 548 F.3d at 1181 (citing Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 195 (1985)). Unless such procedures have been exhausted, the federal court lacks jurisdiction over the claim and it must be dismissed. Id. at 1182. And, in Minnesota, when a property owner alleges that "the government has taken property without formally using its eminent domain powers, the property owner has a cause of action for inverse condemnation." Nolan & Nolan v. City of Eagan, 673 N.W.2d 487, 492 (Minn. Ct. App. 2003) (citing Alevizos v. Metro. Airports Comm'n of Minneapolis & St. Paul, 216 N.W.2d 651, 657 (Minn. 1974)). "Actions for inverse condemnation must be brought to the court through an action in mandamus." Id. (citing Thomsen v. Minnesota, 170 N.W.2d 575, 580 (Minn. 1969)). The mandamus court determines, first, whether there has been a taking requiring the court to compel the initiation of condemnation proceedings, and, second, the amount of damages. City of Minneapolis v. Meldahl, 607 N.W.2d 168, 172 (Minn. Ct. App. 2000).

Plaintiffs' takings claims specifically allege that the City is liable for "inverse condemnation," conduct for which Minnesota provides a cause of action. As discussed

above, such actions must be brought through an action for mandamus, but Plaintiffs failed to bring a mandamus action in state court and instead asserted their inverse condemnation claims for the first time in this Court.  Thus, not only is Plaintiffs' state claim improperly before this Court because it was not brought as a mandamus action, but so is their federal claim because Plaintiffs failed to first exhaust the available state procedures.  Accordingly, the Court lacks jurisdiction over Plaintiffs' takings claims.

> Plaintiffs' arguments to the contrary are unavailing.  First, despite Plaintiffs' conclusory statements otherwise, the City clearly contests that a "taking" has occurred.  And, as the case law discussed above demonstrates, this dispute must be resolved through a mandamus action.  Second, although Plaintiffs claim that it would be futile to "forc[e] Plaintiffs to return to state court to ask Minneapolis to again consider its takings claim," (see Pls.' Opp. at 23), they would not be asking the City to reconsider the claim, but rather the court.  Third, whether Plaintiffs followed the City's claims procedure through to finality is a separate issue from whether they also followed proper judicial procedure.  See Kottschade v. City of Rochester, 319 F.3d 1038, 1041 (8th Cir. 2003) (stating that "[t]he Supreme Court . . . defined the exhaustion requirement to include judicial as well as administrative remedies").  Moreover, Plaintiffs cite no authority for the proposition that the City was obligated to advise them of the proper procedure for pursuing a cause of action in court.  Finally, the case cited by Plaintiffs for the proposition that a plaintiff may bring a direct action under the Takings Clause without pursuing condemnation proceedings does not, in fact, stand for that proposition.  Plaintiffs seem to infer the availability of a direct cause of action from the fact that the plaintiff in Wegner v. Milwaukee Mutual Insurance Co. sought

13

compensation from the City of Minneapolis on both trespass and constitutional takings grounds. See 479 N.W.2d 38, 38 (Minn. 1991). However, the court neither addressed the issue of mandamus nor specified the procedure by which the claims were asserted. See id. at 38–40. And, because "a petitioner is permitted to simultaneously pursue an inverse condemnation claim by way of a petition for mandamus, and alternatively, tort claims," Nolan & Nolan, 673 N.W.2d at 495, Plaintiffs' inference is without merit.

Because Plaintiffs' federal and state takings claims are not properly before this Court, the Court declines to reach the merits of whether a taking actually occurred and dismisses those causes of action without prejudice.

## IV. ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT:**

1. Defendant City of Minneapolis's Motion for Summary Judgment [Doc. No. 27] is **GRANTED**;

2. Counts II and III of Plaintiffs' Amended Complaint [Doc. No. 15] are **DISMISSED WITH PREJUDICE**; and

3. Counts IV and V of Plaintiffs' Amended Complaint [Doc. No. 15] are **DISMISSED WITHOUT PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  September 8, 2015         s/Susan Richard Nelson
                                  SUSAN RICHARD NELSON
                                  United States District Judge